[Civ. No. 15904. Second Dist., Div. One. Apr. 6, 1948.]

ABBOT KINNEY COMPANY (a Corporation), Respondent, v. WILLIAM HARRAH et al., Appellants.

Harold B. Pool for Appellants.

Nicholas & Davis and M. Philip Davis for Respondent.

YORK, P. J.—The corporate plaintiff recovered a judgment for $11,069.66 against defendants William Harrah, Margaret Harrah Schroter, John Harrah, Carleton Kinney and Venice Amusement Company in an action for damages arising out of an alleged fraudulent conspiracy perpetrated against the plaintiff by said defendants. The latter have perfected this appeal from such judgment.

It appears from the record herein, that on March 4, 1921 by an agreement in writing, respondent owner and operator of the Venice Pier leased to Paul D. Howse & Company a certain parcel of realty known as the Plaza Building for a term of 20 years at $500 per month; that on September 6, 1922, appellant John Harrah through assignment from Howse became one of the lessees under the original agreement; that on November 3, 1924, respondent and appellant Harrah (as well as others not parties to this action) modified and reaffirmed the original lease of March 4, 1921; that in 1937, appellants William Harrah and Margaret Harrah Schroter, son and daughter respectively of appellant John Harrah, became the owners of an interest in said lease and went into possession of the Plaza Building, remaining there until the expiration of the lease in 1941.

It also appears that during the period when said William Harrah and Margaret Harrah Schroter occupied the Plaza Building as tenants of respondent they became indebted to the latter in the sum of $16,009.03 on account of unpaid rentals; that during the same period, appellant Carleton Kinney, as tenant of the Ship Cafe, became indebted to respondent for $1,660.63 on account of rentals; and likewise, Robbin and Robbin, a copartnership, as tenants of respondent were indebted to it in the sum of $3,937.87; that the Rob-

bins were brothers-in-law of Louis M. Halper, a director of respondent corporation.

That many years prior to the time these accounts accrued, i. e., on April 1, 1931, respondent corporation issued its trust indenture securing $350,000 First Mortgage 7 per cent Sinking Fund Gold Bonds due April 1, 1944, naming California Trust Company as trustee, at which time all of the property of the corporate respondent, except a couple of small lots, was deeded to said trustee as security for the bonds. That on June 11, 1937, said trustee accelerated the maturity of the principal amount of the outstanding bonds and served notice of default upon respondent which recited, in part, as follows: "Now, therefore, California Trust Company by reason of the happening of said event of the default and by reason of said written request of the holders of more than twenty-five per cent in amount of said bonds now outstanding, has declared and does hereby declare the principal of all outstanding bonds of said issue to be due and payable immediately." That thereafter, in 1940, an executive committee, composed of appellant John Harrah, Carleton Kinney, and one Al Newton, was appointed by the board of directors of respondent and given authority to carry on the business of the corporation between meetings of the said board. This committee served continuously until December, 1944, when it was dissolved. In addition to being a member of the executive committee, Carleton Kinney was also a director and the president of respondent corporation from December, 1937, to December, 1944. Appellant John Harrah, at all times material to this action, was chairman of the executive committee, a member of the board of directors, and treasurer of said corporation, as well as acting agent for appellants William Harrah and Margaret Harrah Schroter in their transactions with the corporate respondent.

As of January, 1944, the overdue accounts, unpaid taxes and indebtedness of respondent exceeded $751,500, while its liquid assets did not exceed $50,000.

Early in January of 1944, Frank Williams (now deceased), who was the largest single holder of bonds of the corporation, urged appellant John Harrah to settle the unpaid rental account of the Plaza Building by turning in bonds of the corporation and thereby reduce the number of outstanding bonds and increase the security for the remaining bonds. At this time the bonds had a reasonable

market value of $600 for each $1,000 bond with all unpaid interest coupons attached.

On January 13, 1944, at a special meeting of the executive committee, at which only John Harrah and Carleton Kinney were present, Margaret Schroter offered $10,000 of Abbot Kinney Co. bonds, including all unpaid coupons in settlement of Plaza Building account; Harry Robbins offered $2,000 in same bonds for settlement of Robbins & Robbins account incurred prior to 1944, and Venice Amusement Company offered $1,000 bond in settlement of Ship Cafe account to January 1, 1944. On motion, all of these bonds were accepted and the manager instructed to deliver them to California Trust Company for cancellation. The 10 bonds turned in on account of the $16,009.03 unpaid rent of the Plaza Building were purchased for a total of $6,000 for the sole purpose of turning them in to respondent corporation in settlement of this account. The two bonds turned in by the Robbins brothers in settlement of their unpaid rental of $3,937.87 were purchased for a total of $1,500 for the sole purpose of turning them over to respondent for such indebtedness. Likewise, the one bond turned in by Carleton Kinney was purchased by him for the purpose of paying off his rental account in the sum of $1,660.63. It was found by the court that at the time the settlement was made, appellants were financially responsible and able to pay the full amount of their respective indebtedness.

Appellants contend that the complaint does not state facts sufficient to constitute a cause of action for fraudulent conspiracy for the reason that "there is not a single allegation in this complaint to show that any of the defendants were guilty of any *unlawful* act."

Paragraph VIII of the complaint alleges: "That some time prior to the 13th day of January, 1944, the exact date of which is unknown to plaintiff, but is known to defendants, the defendants herein entered into a conspiracy with each to cheat and defraud plaintiff, Abbot Kinney Company, out of some of its assets by having said Executive Committee accept on behalf of Abbot Kinney Company, 7% Sinking Fund Gold Bonds of Abbot Kinney Company, at a price considerably in excess of their actual market value, in settlement and discharge of rental obligations owed and accruing to plaintiff, Abbot Kinney Company, by the defendants."

As heretofore stated, appellants John Harrah and Carleton Kinney were members of said executive committee.

Paragraph XII of said complaint then alleges: "That sometime prior to the 13th day of January, 1944, in furtherance of the aforesaid conspiracy and as a part thereof, the defendants William Harrah and Margaret Harrah Schroter purchased ten $1000 7% Sinking Fund Gold Bonds of plaintiff corporation, for the total purchase price of $6,000 on the open market. That on or about the 13th day of January, 1944, the defendants John Harrah and Carleton Kinney, at a meeting of the Executive Committee of plaintiff corporation, in furtherance of the aforesaid conspiracy and as a part thereof, voted and agreed to accept an offer made by Margaret Harrah Schroter to assign, set over and transfer to plaintiff . . . the said ten $1000 7% Sinking Fund Gold Bonds as payment in full for the said rental indebtedness to the plaintiff corporation in the sum of $16,009.03, as aforesaid. That on or about said 13th day of January, 1944, in furtherance of the aforesaid conspiracy and as a part thereof, and after authorization so to do had been given by the Executive Committee as aforesaid ten $1000 7% Sinking Fund Gold Bonds of Abbot Kinney Company were delivered to said Abbot Kinney Company and said indebtedness for rental in the sum of $16,009.03 was marked fully paid on the books of account of plaintiff corporation. That all of the defendants knew that the defendants John Harrah and Carleton Kinney were members of the Executive Committee of Abbot Kinney Company and were members of the Board of Directors of said corporation and that said transaction was fraudulent and in violation of the fiduciary obligations which defendants John Harrah and Carleton Kinney owed to the plaintiff corporation. That defendants John Harrah and Carleton Kinney knew that the said ten bonds had been purchased by the defendant Margaret Harrah Schroter and William Harrah for the sum of $6,000.00.

"XIII. That at the time plaintiff corporation accepted said ten $1000 7% Sinking Fund Gold Bonds of plaintiff . . . in payment of said rental indebtedness of $16,009.03, the defendants owing the same were financially able to pay the full amount of said indebtedness in the sum of $16,009.03 to plaintiff and would have paid the same to plaintiff . . . if it had not been for the fraudulent acts and conspiracy of defendants, as aforesaid.

"XIV. That said ten Abbot Kinney Company bonds so turned over to plaintiff by defendants, other than Carleton Kinney, in settlement of said indebtedness of $16,009.03, as aforesaid, did not have a market value in excess of $6,000 at the time of said transaction and could have been purchased by plaintiff at said price of $6000, which facts were well known to all of the defendants herein.

"XV. That as a direct result of the fraudulent settlement of the above claim by defendants and of the conspiracy above set forth, plaintiff was damaged in the sum of $10,009.03.''

The complaint then alleges as a separate cause of action the indebtedness of Carleton Kinney and the Venice Amusement Company for rental of the Ship Cafe in the amount of $1,660.63; the offer of said Carleton Kinney to turn over one $1,000 bond in payment thereof, the acceptance by John Harrah and Carleton Kinney, as members of the executive committee, of such offer in payment of such rental resulting in damage to plaintiff in the sum of $1,060.63, all in furtherance of the conspiracy to defraud the plaintiff, and in violation of the fiduciary obligation which said John Harrah and Carleton Kinney owed to plaintiff corporation.

There is no escape from the conclusion that the complaint states a cause of action.

As was stated in *Mox, Incorporated* v. *Woods*, 202 Cal. 675, 677 [262 P. 302] : ''The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design. The cause of action is the damage suffered. 'It is a general and well-settled principle of law that, where two or more persons are sued for a civil wrong, it is the civil wrong resulting in damage, and not the conspiracy, which constitutes the cause of action. (*Herron* v. *Hughes,* 25 Cal 555; *Davitt* v. *Bakers' Union,* 124 Cal. 99 [56 P. 775] ; *Dowdell* v. *Carpy,* 129 Cal. 168 [61 P. 948] ; *Menner* v. *Slater,* 148 Cal. 284 [83 P. 35].) In such an action the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tort-feasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity. (*Cohen* v. *Fisher,* 135 App.Div. 238 [120 N.Y.Supp. 546] ; *White* v. *White,* 132 Wis. 121 [111 N.W. 1116] ; *Miller* v. *John,* 208 Ill. 173 [70 N.E. 27].) A plaintiff is entitled to a joint recovery of dam-

ages against such defendants as he can show have united or cooperated in inflicting a wrong upon him. (*Herron* v. *Hughes, supra; More* v. *Finger,* 128 Cal. 313 [60 P. 933]; *Nevin* v. *Gary,* 12 Cal.App. 1 [106 P. 422].)' (*Revert* v. *Hesse,* 184 Cal. 295, 301 [193 P. 943]; see, also, *Bowman* v. *Wohlke,* 166 Cal. 121 [Ann.Cas. 1915B, 1011, 135 P. 37]; 5 Cal.Jur., p. 528, secs. 29-31.) The advantage gained in charging a conspiracy is that the act of one during the conspiracy is the act of all if done in furtherance thereof, and thus defendants may be held liable who in fact committed no overt act whatsoever and gained no benefit therefrom (*Revert* v. *Hesse, supra*)." See, also, *Neblett* v. *Elliott,* 46 Cal.App.2d 294, 302 [115 P.2d 872].

Appellants also urge that the evidence does not support the finding that a conspiracy ever existed or that any fraud was committed; and even assuming that a conspiracy did exist, William Harrah and Margaret Harrah Schroter did not participate therein and knew nothing about it.

██ It is conceded that both John Harrah and Carleton Kinney were fiduciaries of respondent corporation at all times material to this action. Carleton Kinney was its president, a director and member of its executive committee; John Harrah was its treasurer, a director and chairman of its executive committee. It was held in *Lowe* v. *Copeland,* 125 Cal.App. 315 at 332 [13 P.2d 522], that the president and directors of a corporation occupy a fiduciary and trust relationship thereto and they are not permitted to assume a position adverse to the corporation. Transfers of corporate property by such officers to themselves are voidable, and a trust arises in favor of the corporation as against an officer as to anything so received.

With respect to the participation of William Harrah and Margaret Harrah Schroter in the alleged fraudulent transaction, their father, appellant John Harroh, testified as follows:

"Q. Prior to the meeting of the executive committee on January 13, 1944, had you had a discussion or conference with any of the defendants herein regarding the settlement of any of these accounts? . . . A. Yes. Q. With whom had you discussed the matter? A. I had talked to William Harrah about it and I had talked to Margaret Schroter about it. Q. And what was the occasion of that discussion? A. The occasion was that Frank Williams told me he had sold his horses which he had been devoting his time to, racing horses,

and he wanted to spend more time in connection with the Kinney Company and he would like to get those two long-standing rent accounts secured by one of the Robbins and the other of the Plaza Building Company and he talked to me about it, so we had two or three discussions and then I called up Bill (Harrah) and talked to him about it and then I talked to Frank and told him that Bill, —— to get hold of the loose bonds —— Frank wanted loose bonds turned in and if he could get hold of loose bonds he would get Margaret to turn in ten bonds in settlement of the account, that he could not turn them in himself by reason of what we called the six-party agreement on the bonds whereby he had agreed with the parties to that agreement not to buy any bonds. But he didn't know whether he could do that or not, but he would do that if he could do it, so Frank said it was agreeable and then I talked to Margaret about it and all I told her was that it looked like the old rent account could be settled that way. No, first I talked to —— yes, speaking of talking to the defendants, I talked to Margaret about it. Q. Yes. A. And I told her Frank wanted it done and Bill wanted to do it and she would have to be the one to do it because Bill couldn't on account of the contract he had entered into and she said that was all right, so she wrote out some kind of a rental statement, or rather I wrote it out and she signed it, directed to the Kinney Company which said she was turning in ten bonds in settlement of the Plaza Building Company account.''

▮ Appellants John Harrah and Carleton Kinney were obligated to protect the best interests of the respondent corporation, and instead of closely scrutinizing the suggestion of Frank Williams, who was the largest holder of Abbot Kinney bonds which were long in default and upon which the statute of limitations had run, and to whose advantage it was to arrange for the retirement of the bonds not covered by the trust indenture,—said appellants Harrah and Kinney embraced such suggestion and proceeded to put it into effect because each would personally benefit to a substantial degree thereby.

The record herein is replete with evidence of appellants' fraudulent dealings and fully justifies the judgment of the trial court.

For the reasons stated the judgment appealed from is affirmed.

Doran, J., and White, J., concurred.